*254 Opinion op the Court,
bv Judge Mills.
Sarah Meriwether was possessed of sundry slaves, as dower from the estate of her deceased husband.— William N. Meriwether, the appellant, one of the heirs to whom the reversion belonged after the dower estate *255 was determined, purchased of Edward M. Booker, who had married one of the heiresses, -and his wife, their interest in that reversion, for the sum of two hundred and twenty dollars actually paid, and they executed to him a writing to the following effect, to wit:
That the purpbysi„;.^as&a fore-the iyevitbe1 widow °f is no ground for resisting T^jef that theTontract was en-*are(1 into on tionThaTthe purchaser would also ^¡r a”°’ on account of the inadequacy of the price, when the party had to run the risk of the slaves being sold, to wait the death of the widow, &c.
*255 “We, Edward M. Booker and Sarah Booker, wife, do hereby bind ourselves, our heirs, executors, administrators or assigns, to convey or cause to be conveyed unto William N. Meriwether, his heirs, &c. all our titles, privileges, &c. in the negroes of Sarah Meriwether, which now under the virtue of a widow’s whenever said Meriwether shall request, under the penalty of $2,000. Witness our hands and seals, this 15th day of June, 1819.
Teste, Edward M. Booker, (Seal.) Jcrncs Meriwether. Sarah Booker, (Seal.)”
At the time of this contract, the said Sarah Meriwether was somewhere-between forty and fifty years of age, and although she was then somewhat unwell, was no immediate prospect of her dissolution. She, however, died shortly afterwards, and commissioners were appointed, who divided her dower slaves among the heirs, and two of them, valued then at about $600, in the division, were assigned to Booker and wife. At the division, they were not present, and the appellant took these slaves into his possession, and kept them, under his aforesaid purchase. Some time afterwards, Booker and wife, the now appellees, brought their action of detinue against the appellant, for these slaves, and the next day, William N. Meriwether, the appellant, filed this bill in chancery for a specific ance of the contract; and each suit progressed in’ same court, until the suit at law was first tried, and the appellees were successful in obtaining a verdict and judgment for the slaves, and then, in an answer, among other matters of defence, set up in bar and relied the judgment at law. To avoid the effect of this, after an interlocutory decree, by the consent of the appellees, he was permitted to amend his bill, which they never answered, but permitted to stand as confessed, stating, that on the trial at law, the counsel for the appellees obtained from the court an instruction, that the aforesaid contract, which the appellant then set up as a defence at law, was executory only, and that, as it was not actually executed, the appellant derived no title by *256 which he could defend his possession at law, and if he had any remedy, it was in a court of equity; and the appellant insists' that the appellees ought not to be at liberty to decline the jurisdiction of a court of chancery now, having appealed to it on the trial at law.
A husband may sell the reversionary interest of his wife to slaves before a dower estate in them has terminated.
The wife’s estate in a chattel real, may be assigned by the husband.
There are exceptions to the rule, that equity will not specifically eriforce the performance of an agreement with respect to a-chat tel -
One who hath the absolute property and-right to immediate possession, may maintain detinue, although he hath never had actual possession. detinue may be used for ecifioall enforcing contract fora chattel,
*256 The court below refused to give to the appellant the relief sought, and to quiet him in the possession or complete his title to the slaves; but directed an account to be taken of the money, with its interest, paid by the appellant to the appellees, and of the hire of the slaves held by him; and a small balance appearing in favor of the appellant, decreed that he should hold a lien on the slaves, until that balance was .paid, and that upon the payment thereof, the appellees should be at liberty to regain the possession of the slaves, by execution on the judgment at law. From this decree Meriwether has appealed.
We will first examine the objections to the bill, relied upon in the answer of the appellees. One of these is, that the appellant is a physician, and by his superior skill, foresaw the inevitable death of the widow. To this it may be answered, that it does not appear that he was her physician, or that her death was probable, at the date of the contract, or that any medical skill could have foreseen her speedy dissolution; and we are unwilling to attribute to any physician, the general prescience of the time of the death of his fellow beings.
It is insisted, that the contract was entered into on the expectation that the appellant would purchase the interest of James Meriwether, another heir, and was made on the express condition that such other purchase should be made, which was never done. It is true, that one witness proves this in one deposition; but, in a scond, he weakens, and in some measure contradicts his testimony. James Meriwether 'was present, and a verbal contract was then made with him for his share, at the same price; and hence it was, no doubt, expected that the appellant would get his proportion also. This contract with James Meriwether, through casualty or some circumstance not worthy of detail, was not carried into effect, though James Meriwether deposes he was willing it should be completed, after the division of the slaves. But there is no pretence for saying that there was such a conditionality in the contract with the appellees. The writing forbids such *257 proof; and we cannot see what motive the appellees should have, that such contract with James Meriwether should take place; what benefit would accrue to them, if it did, and what injury, if it did not.
Jt is also objected, that William N. Meriwether was to j)ay all the debts of the widow who held these slaves, This is an addition to the contract, not supported by proof. It was spoken of at the time, that she was debt, and the appellant agreed to run the risk of those debts, if they should fall on the slaves, and her interest should be sold in discharge thereof; and accordingly, one was sold, which is now in dispute. This was one of the hazards to which the appellant was exposed in the contract, and conduces to show that the contract was fair, and that his was a risking bargain; for there is no doubt, that the life estate of the widow might have been sold under execution in discharge of her debts, and thus the slaves might pass into other hands, and hence be exposed to greater probability of loss by removals or ill-usage.
It is alleged by the appellees, that the appellant fraudulently omitted to insert several additional stipulations in the writing, which he ought to have clone. It is sufficient to say, that there is no. proof of this charge.
It is objected, that the purchase was made at a very inadequate price. It is in proof, that at the time of the sale, if the slaves had then been sold and delivered, they were worth four hundred dollars. The jury in the verdict at law, valued them at five hundred dollars. The^appellant made certain, and nearly immediate payment. Besides the risk of their being sold under execution, he wras to await the death of the widow, which might have been after the death or infirmity of the slaves, and after the death of all parties concerned. If he, by any such event, never obtained the slaves, he forever lost his money, as there was no agreement to restore, on any event. Under such circumstances, no prudent man could be expected to pay more than he did-, for the interest sold.
It is objected, that the necessities of the appellees forced them into the contract. There is no proof of this point of defence, or that the appellant took advantage of this supposed necessity.
It is also insisted, that Booker, the appellee, could not sell these slaves; that the -title was in his wife, and *258 therefore the contract was' not obligatory on her, and |¡je appe¡jant could not, therefore, be entitled to relief. This is an erroneous assumption of law. Here was a certain interest vested in the wife, after the determination of a particular estate; and if it be conceded, that such an interest would survive the wife, upon the death-of the husband, which is riot free from doubt, it is clear that the husband could dispose of it in his lifetime, and his transfer or sale thereof would be good ; for even the wife’s interest in a chattel real, which would doubtless survive to the wife, may be assigned by the husband, and the assignee will hold the estate against the- surviving wife. Jacob’s Law Die. 273. It then follows, that it was competent for Booker, the appellee, to dispose of this future, but vested, interest of his wife in these slaves, without her consent, and the sale would have been good, without uniting her in the contract.
It is also contended that equity will not specifically enforce the performance- of an agreement with respect to a chattel; and on tliis point,. Caldwell vs. Myers, &c. Hard. 551, is relied on. It is no doubt correct, that equity will not enforce an executory contract for the sale of a chattel, and the case relied on extends the rule to slaves;- but this is a general'rule, and is shown to be liable to exceptions, by the case cited. Admitting this bill to be a bill for specific performance, it might be plausibly contended that it came within the exceptions stated in the case cited; but, conceding that it is not within the exceptions, and that a bill will not lie to coerce such a contract specifically, we do not view this as a bill to enforce the contract, but to quiet the possession of the slaves. The appellant holds them, and the appellees are trying to regain them. The contract is ,so far executed, that the appellant’s title is so far complete, that nothing else is necessary. If, then, the bill can be sustained on other grounds, it cannot be overturned by the principle contended for.
It is finally insisted that the plaintiff’s claim furnished him with a valid defence at law, and that of course it cannot avail him in equity. We do conceive that the matter set up in the bill ought to have been successful at law. The action of detinue may be used for specifically enforcing contracts at law, according to the principles recognized by this court in the case of Hall vs. McDowell, 2 Bibb, 610. And after the death of the- *259 widow in this case, and the division of the slaves, we perceive no reason why the appellant might not have enforced his contract against the appellees, by an tion of detinue, if they had the possession. It would then seem necessarily to follow, that what would be a good cause of action in the hands of the appellant, ought to furnish him with a good defence, when he' held the possession, against the same party.
If, then, there is no peculiar circumstance to aid the1 jurisdiction of a court of equity on this ground, the appellant must fail. In an amended, or rather a supplemental. bill, filed by consent after the trial at law, it is' stated and taken as confesséd, that the same matter was-set up at law, but was, on the motion of the now appellees, decided to be unavailing at law, and only admissible in a court of equity. Taking this as true, it is no> hardship upon the appellees, to hold them to the decision of the tribunal to which they have appealed. Justice requires that they should be concluded by a decision between them and their present adversary, where' the same matter is in contest. Such is the principle' settled by this court in the case of Ford's Executors vs. Wilson's Administrators, 2 Bibb, 540, and it fully sustains the jurisdiction of a court of equity in the present case.
The decree of the court below must, therefore, be reversed with costs, and the cause be remanded, with directions to grant a perpetual injunction against the' judgment at law, and to quiet the appellant’s title, and to decree to him all his costs expended, both at law and in equity.
John Logan,- Esq., counsel for the appellees, filed the' following petition for a re-hearing:
The counsel for the appellees, respectfully solicits the court to revise their decision in this case. Nothing but a sense of imperious duty, could prompt him to1 make this application. A novice in practice before this court, and unaccustomed to doubt the correctness of their decisions, he is fully conscious now, as heretofore, of his inability to do justice to the cause of his clients*-
*260 The opinion of the court, as understood by the CóUtlsel for the appellees, is not predicated upon the merits of the appellant’s case in a court of equity; but either upon the erroneous instructions of the inferior court, given to the jury upon the motion of tire plaintiffs there, or the erroneous arguments or suggestions of the appellees’ counsel, upon the argument of that motion.
The court, in the opinion delivered in this case, ad* mits it to be a general rule, “ that equity will not enforce an executory contract for the sale of chattels,” and that slaves are upon the same grounds; but say also that the general rule is liable to exceptions, and that it might be'plausibly contended, that this case was within the exceptions. With deference to the suggestion of the court upon this point, it seems to the counsel of the appellees, that a re-examination of the authorities touch* ing this subject, will strip the case, as to this ground, of all plausibility; but as the opinion of the court does not rest upon this plausibility, the counsel for the appellees will not trouble them with it.
The opinion is given under the coriception, that the appellant’s case is not within the exceptions to the general rule, and that a “ bill will not lie to coerce such a contract specifically;” but the appellant’s bill is sustained by the court, upon the assumption that it was not a bill, to enforce the contract, but to quiet the possession of the slaves; that the contract was executed, and the defendant at law invested with the legal title to the property. If this view of the case be correct, it is manifest the appellant was unconscious of his rights; for the bill, on its face, contains all the characteristics of one for the specific execution of a contract. It is alleged therein* that the title was in the appellees; that they refused to convey to the complainant; and prays of the chancellor to decree the specific execution of the contract, and makes no prayer to quiet the possession of the slaves. But it is respectfully contended, that if it were a bill for quiet enjoyment merely, and not for the execution of a contract, it cannot be sustained* for surely the possession of the appellant, obtained without the consent of the original owners, cannot increase his rights, in either a court of law or equity. Such a principle would elevate stratagem and force above the law, and justly lay it liable.to the imputation of encouraging immorality. But few would hesitate as to the means of acquiring *261 possession of property, if the tribunals of justice would quiet that possession, which, according to the rules of law, they could not grant. The case will, therefore, be considered as if the possession had not been changed, or rather as if the rights of the parties had not been changed by the possession of the appellant.
The bill of the appellant is sustained by this court, upon the predication that the counsel for the plaintiffs in the action of detinue, moved the court to instruct the jury, that the contract between the parties was executory, passed no title to the defendant in that court, and that the remedy of the defendant, if any, was in a court of equity; and that the court instructed the jury accordingly.
It is respectfully insisted, that the decision of the inferior court was correct. The appellees instituted an action of detinue against the appellant, for the recovery of the slaves allotted to them by the commissioners,, upon the division of the dower slaves of Mrs. Meriwether. The appellant had taken possession of them without their consent. The appellant relied upon a covenant given prior to the division of the slaves, in bar of the action. By that covenant, the appellees bound themselves to convey, or cause to be conveyed to the appellant, upon request, all their title and privileges in and to the slaves, then in possession of Sarah Meriwether. The appellees never had conveyed their interest; there is no evidence that they had even been requested to convey. The commissioners allotted the negroes to the appellees; not until then did they have the exclusive title. Prior thereto, they had but an undivided sixth or seventh part of all the dower slaves. It is obvious the title to the slaves did not pass at the execution of the contract; because the appellees had not, at that time, the title to the slaves in controversy, and because, also, the appellees bound themselves to convey upon a contingency; and it is respectfully insisted, that a covenant to convey, irresistibly implies that no title then passed. If the title did not then pass to the appellant, when did he acquire it? The writing between the parties, the court has said, is the exclusive evidence of the contract; that, upon its face, it carries conclusive evidence, that neither party believed the title then changed. Could it at any time be changed, without the knowledge or consciousness of either party? If it *262 wag not then changed, when was it? Was it at the time division took place by the commissioners ? The were not there, ancl it is inconceivable that they were secretly divested of their interest the moment of its origin, without any act of their own, and without their knowledge. Can the title to slaves be of that subtle nature, that it will pass from one to another, without the act or knowledge of either? The appellees were to convey upon request. No other mode of passing the title was sufficient to discharge the obligation. If the appellant had brought an action of covenant when the action of detinue was instituted by the appellees, could he truly have pleaded covenants performed? The appellant alleges in his bill a demand of a conveyance, and a refusal; it is unanswered, and there is no proof. If the allegation be true, he was endeavoring to obtain the execution of the contract, and the appellees refused to convey. Did not both parties understand that the title was unchanged? Does not the intention of parties govern in contracts, when that intention can be ascertained? But if the allegation be untrue, then the contingency had not happened, and without that, the appellant could have no title.
It is confidently, but respectfully, contended, if the appellant had no title, he could not sustain the action of detinue, at least against the legal owners; nor could he, according to law, bar their action. It is respectfully urged, that no adjudicated case can be found, in which it was decided that the action of detinue could be supported by the vendee of a chattel against the vender, without the legal title to the chattel anterior to the institution of the suit; the title must precede the suit. This suit does not produce or obtain the title; it consummates the title by drawing to it the possession; it cannot draw title from the person invested with it.— When the suit may be instituted, it is to recover the thing specifically; but cannot be the means of obtaining title to the thing sued for. He must have the title before, or he can have no cause of .action for the thing demanded. The counsel- for the appellees thinks this principle is recognized and decided in the case of Tunstall vs. McCleland, 1 Bibb, 186.
The court, in this case, decide that u the action of detinue may be used for specifically enforcing contracts at law,” and refer to 2 Bibb, 610. It is conceded it may,. *263 sn all cases in which title had accrued to the plaintiff, prior to the institution of the suit, be used to obtain the possession; but it is respectfully insisted, that it is in no case decided, that it may be used to obtain the title. And with deference to the opinion of the court, it is conceived that the case of Hall vs. McDowell, cited, is perfectly compatible with the position contended for. In that case, the plaintiff had an absolute bill of sale of the slaves sued for; but by an article of agreement, it appeared he was not to have the property until he performed certain acts for the benefit of the seller. He did perform them, and the court expressly say, he had thereby acquired the absolute right of property. If so, could his right of action be questioned, because originally executory? It is for that principle the appellees now contend. In that case, (as well as those cited by the court in that case,) no further act was to be done to complete the title at law. In that case and the others referred to, it is manifest that the venders and vendees, intended the title to pass without any further act, and considered them complete as to the title. In all those cases, there was “a good bargain and sale of the thing to alter the property, and the seller may maintain an action for the thing bought.” But suppose there had not been good bargains and sales to alter the property, what then would be the conclusion? That the action for the thing could not be supported. But in this case, it incontrovertibly appears, that it was not the intention of the parties, that the title should pass.to the appellant, without other acts, to have been performed by each party. The appellees bound themselves to convey thereafter.— They bound themselves to convey upon request. If they ever were requested, they refused to convey; and surely a refusal to convey the title, could not have equal efficacy with a conveyance. I repeat, when did a cause of action accrue to the appellant?
If the appellant could not sustain an action against the appellees, had they been in possession, it necessarily follows, that he could not bar the plaintiff’s action, upon the grounds assumed in the defence. With great deference to the opinion of this court, it is concluded, that the opinion of the inferior court would have been correct in instructing the jury that the defence of the appellant was insufficient to bar the action of the appellees, at law.
*264 But conceding that the inferior court erred, it is re» spectfully contended, that the error of that court furnishes no equitable ground for the interposition of the chancellor. That it is an inflexible rule of law, that the errors of an inferior court can be corrected by an appellate tribunal alone, surely cannot now be questioned. What is it in this case, which should cause this wise and well settled rule, to bend to the power of a court of equity? Is it the fact that the court erred upon the motion of the appellees’ counsel? It cannot be supposed that that circumstance could have any such effect ; because, in nine hundred and ninety-nine cases out of a thousand, the errors of inferior courts are committed at the instance of the counsel of the party in whose favor the decision is given.
The error having been committed, in this case, upon the motion of the appellees, surely cannot have any weight with the court. If the fact that the court erred upon the motion of the appellees’ counsel, cannot be the basis of equitable jurisdiction, what are those uncontrollable circumstances, in this case, which delivered the appellant from the effects of the rule of law before mentioned? Can it be, that the assumed, incorrect and irrelevant observation of the court or the counsel for the appellees, can have that operation? That of the court cannot, surely, have such an effect; because, in all erroneous decisions of a court, it must either assume false premises or draw incorrect conclusions, and often does both; consequently, such a prin.ciple would invest a court of equity with the power to annul every decision of a court of law, deemed erroneous. It never was contended by any chancellor, that the bad reasoning of a court of law required his .correcting power, although it has been contended and ,decided that the errors of that court gave jurisdiction >to a court of equity, a doctrine long since exploded, .and worthy of oblivion. And, with deference to the court, it does seem that if neither the errors, bad reasoning, nor incorrect suggestions of the court, can constitute the foundation upon which to erect the jurisdiction of a court of equity, much less should the irrelevant, incorrect or disingenuous arguments or suggestions of an adversary counsel, constitute such a foundation.— A party may be deceived by the erroneous opinions of a court, or by .incorrect suggestions, not pertinent to *265 the case before them, or by false ideas entertained by their own counsel; because the judge is selected for his wisdom, integrity and impartiality, and he chooses his counsel because he confides in his intelligence and fidelity; but the idea of deception by the arguments of adversary counsel, seems extraordinary in the extreme. But misplaced confidence in the opinion of the court and his own counsel, furnishes no ground to apply to a court of equity. If not, should the expression of his adversary’s counsel, having no bearing upon the case before the court, have that effect? Are the boundaries of courts of law and equity so obscurely, so vaguely defined, that they can be varied and shifted by the bad arguments, idle suggestions, or the disingenuousness of counsel? When a party loses his case at law, by the errors of the judge, or the errors and mistakes of his own counsel, there is some plausibility in the exploded opinion that he ought to be relieved in equity; but equity is incompetent to relieve him upon either ground. This principle is fully established in the case of Nelson and Heth vs. Hancock and others, 4 Hen, and Mun. 491.
And what were the arguments or assertions of the adversary counsel in this case, to which such great efficacy are given? Nothing more than this: “ If the appellant had any remedy, (for the recovery of the negroes specifically,) it was in a court of equity.” Was this even an intimation that he might succeed in equity? Or, at any rate, was it more than an intimation? Could it be. an admission that he could or ought to succeed there? Can those observations he considered an appeal to a court of equity? Are they sufficient to break down the well settled rules of law? Are they to give jurisdiction to a court of equity, acknowledged to be destitute of that jurisdiction, but for those expressions? If such vague, indefinite language of counsel can destroy and annul the verdict of a jury in behalf of his client, the trial by jury is worse than an idle mockery; it is but the empty, but ruinous, prelude to the real controversy before the judge alone.
But should the acts of the appellees’ counsel bind them beyond the case in which he was employed? He was employed in the case at law ; but the declarations of the counsel which are to clothe the chancellor with the power to deprive him of his verdict and judgment *266 at law, were altogether irrelevant to the case before the inferior court. The question there was, had the appellant a good defence to make? The observation of the appellees’ counsel, by which he is to be deprived of his verdict, was, “ if he had any remedy, it was in a court of equity.” This, the court intimate, was an appeal to a court of equity. Had the counsel the right or power to make such appeal? If the jurisdiction of a court of equity can be sustained upon this ground, would it not also be sustained in a case of slander or assault and battery, in which the defendant might justify? In that case, would the chancellor take jurisdiction, if the counsel for the plaintiff should successfully move the court to instruct the jury that the defendant was precluded from proving the words, or the first assault, in a court of law, and that his remedy, if any, was in a court of equity? It is presumed not; and yet no difference in principle is perceived, between that case and the one decided by this court, if the court erred in excluding the defence of the appel- . lant upon the trial at law.
The case of Ford’s executors vs. Wilson’s administrators, is cited as decisive in favor of the jurisdiction of a court of equity in this case. With great deference to the opinion of the .court, that case cannot be considered an authority in point. The decision in that case, upon the question decided, cannot be doubted ; it is based ■upon grounds which never can be shaken; but it is not conceived that the point now in controversy was there decided, and there is a striking difference in the characteristic features of that case and the one before the court. That was the case of an administrator, in which there are strong reasons for a relaxation of the •rules of law. There, a direct admission or assertion was made, that a court of equity could grant relief. In that case there might in fact have been deception.—■ Here, there could be none; because the appellant, the dext day after the institution of the suit at law, filed the bill now before the court, in which he alleged he was without remedy at law; that equity alone was competent to give him relief; that the appellees refused to convey to him the title to the slaves, and prayed the specific execution of the contract; that, without the aid of a court of equity, the appellees would obtain the possession of the slaves. Could it, then, at a subsequent *267 period, whilst that bill was depending, be unjust or deceptious in the appellees, to contend for the same proposition? Could the appellees’counsel contending at the trial at law for what the appellant before and then contended for in his bill, sustain that bill, which before was unsustainable ? Was he prevented from defending himself at Jaw, by the acts of the appelles ? Was it unjust or iniquitous to assume the ground he himself then relied upon? If the appellees could be considered as having submitted to the powers of a court of equity, ought it not to be viewed as a submission upon the general principles of equity, unaided by the motion of the appellees’ counsel ? If it was a submission at all, it must be considered as one under the then existing circumstances. Could it be more than an agreement to meet the appellant upon facts then contained in his own bill? But those facts, the court admits, were insufficient.
But, upon another ground, the appellees had a right to make the motion. The appellant had applied to equity; he had made his election; was it right, was it legal, that he should sue in chancery and defend at law; that he should have two chances to one; that he should, whilst he was prosecuting a suit in chancery, be permitted to try the same matter at law ? He did defend at law; he was defeated there; now he is to be permitted to succeed on the very points tried at law. This cannot be just; it is surely not equal justice;, and he is to. succeed, because it is urged that the court of law erred in deciding as the appellant contended in his bill in. equity.
But does it judicially appear, that any motion was= made to the inferior court,, or that any point of law was-there decided ? This, it is said, appears by a supplemental bill, setting forth those facts; which bill was taken for confessed. It is humbly conceived that this is an assumption of fact, unauthorized by the record.. It is true, that a supplemental bill was filed; but that bill was not taken for confessed, nor had the appellant a right to have it taken for confessed; for it appears, at the same term, probably on the same day, the appellant moved to set aside the interlocutory decree of the court, which was overruled, and the parties went to trial without any motion for a continuance, for the purpose of proving the allegations in his supplemental bilk. *268 it cannot be supposed that the consent to file a bill, is, in ]aw or equity, an admission that every thing alleged is true. If so, every fact alleged in every amended bill, amended declaration, amended plea, additional plea, or indeed any plea or declaration, or bill filed by consent of the parties, must be taken as incontrovertibly true. If such should be the principles of law or equity, it seems that quibbling should no longer be considered contemptible, but evidence of consummate skill and wisdom.
But even admitting the appellees are wrong in the supposition that the amended bill is not admitted to be true, ought it not to have been alleged, that the defendant there had without his plea, and that he had not excepted to the opinion of the court? There is nothing in the record to show that the appellant did not except, and that he might not, at any moment, have the errors of the inferior court corrected by the tribunal established by law for that purpose.
The court is respectfully solicited to grant a rehearing of the case.
JOHN LOGAN, for appellees.
But the court, on consideration, overruled the petition.